**FILED** SEP 25 2015
CLERK, U.S. DISTRICT COURT
NORTHERN
By _____ Deputy

**SEALED**

United States District Court

DISTRICT OF _____ TEXAS

In the Matter of the Search of
(Name, address or Brief description of person, property or premises to be searched)

1509 Shamrock Bend Lane, Apt 3923, Arlington, Texas 76012

**APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**

CASE NUMBER: 3:15-MJ-
**3-15MJ710-BF**

I __Cynthia M. Roberts__ being duly sworn depose and say:

I am a(n) <u>Special Agent with the Social Security Administration (SSA) Office of the Inspector General (OIG)</u> and have reason to believe that on the person of or <u>XX</u> on the property or premises known as (name, description and/or location)

1509 Shamrock Bend Lane, Apt 3923, Arlington, Texas 76012

in the __NORTHERN__ District of __TEXAS__ there is now concealed a certain person or property, namely (describe the person or property to be seized)

(SEE ATTACHMENT A).

**which is** (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
property that constitutes evidence of the commission of a crime, contraband, the fruits of crime, and is, otherwise, criminally possessed, **concerning a violation of Title** __42__ **United States code, Section(s)** __1383a(a)(3)__. The facts to support a finding of Probable Cause are as follows:

(SEE ATTACHED AFFIDAVIT OF Special Agent Cynthia M. Roberts).

**Continued on the attached sheet and made a part hereof.** XX Yes __ No

_Signature: Cynthia M. Roberts_
Signature of Affiant
Cynthia M. Roberts
Special Agent, SSA OIG

Sworn to before me, and subscribed in my presence

__September 25, 2015__ at __Dallas, Texas__
Date                                                    City and State

**PAUL D. STICKNEY**
**United States Magistrate Judge**
Name and Title of Judicial Officer

_Signature_
Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Cynthia Roberts, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the residence of Michael Mitchell, located at 1509 Shamrock Bend Lane, #3923, Arlington, TX 76012, hereinafter "PREMISES," more fully described in Attachment A, for certain things particularly described in Attachment B.

2. I am a Special Agent (SA) with the U.S. Social Security Administration (SSA), Office of Inspector General (OIG), and have been since November 2012. I have been a Special Agent with other federal agencies since September 1997. The statements contained in this affidavit are based upon my investigation, information provided by other law enforcement personnel, and on my experience, and training as a Special Agent.

3.  In order to show a violation of 42 U.S.C. § 1383a(a)(3), Concealing a Disqualifying Event from the Social Security Administration, the government must provide probable cause as to each of the following elements:

> First:  That an individual received Supplemental Security Income payments;
>
> Second: That that individual had knowledge of an event affecting his initial or continued rights to SSI;
>
> Third:  That that individual knowingly concealed or failed to disclose this event to the Social Security Administration; and
>
> Fourth: That that individual concealed or failed to disclose this event to the Social Security Administration with the intent to fraudulently secure payment of SSI in an amount greater than was due him or when no payment of benefits to him was authorized.

4.  The SSA is an independent agency of the executive branch of the United States. The SSA is responsible for administering programs under the Social Security Act, codified at Title 42, United States Code, Section 301, et. seq. Relevant to the instant affidavit, these programs include the Supplemental Security Income program for the Aged, Blind, and Disabled under Title XVI of the Social Security Act (hereinafter "SSI Program"). The SSI program, which is funded through general tax revenues of the United States, provides monthly cash benefits to individuals who are medically "disabled" within the meaning of the Title XVI and who, in addition, are eligible for the program on the basis of financial need.

5. The ability of the SSA to properly make initial determinations as to an applicant's medical and financial eligibility for the SSI program is directly dependent upon the SSA's access to accurate and current information regarding that applicant. Moreover, if an applicant is initially found to be eligible, and therefore becomes an SSI recipient, the SSA's ability to properly determine that recipient's continuing eligibility, and the correct monthly benefit due that recipient, likewise is directly dependent upon the SSA's ongoing access to accurate and current information regarding that recipient.

6. The SSA requires disabled SSI recipients to advise the SSA of any improvements in their medical condition, their return to work of any kind, and any changes in their income, resources, address, living arrangements, family size or composition, family income or resources, or absences from the United States for thirty consecutive days or more. The SSA also requires SSI recipients to periodically complete various forms and questionnaires as a means of updating eligibility and benefit level information. Like the initial application, these forms and questionnaires again notify the recipient of his or her continuing responsibility to notify the SSA of any changes in his or her condition.

7. A representative payee is an individual approved by the SSA to manage a beneficiary's funds to ensure that his needs are met. Representative payees are typically named to receive benefits on behalf of a beneficiary who is incompetent, either by age or disability. In cases where a beneficiary is appointed a representative payee, that representative payee is responsible both for using all funds paid for the benefit of that beneficiary for his daily needs and promptly informing the SSA if the beneficiary's condition improves or he returns to work.

8. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

9. Probable cause exists to believe that evidence, fruits, or contraband can be found on the PREMISES related to an investigation that Michael Mitchell, Doreen Mitchell, John Mitchell, and Sonny Mitchell knowingly participated in a scheme to defraud the Government related to SSA benefits in violation of 42 U.S.C. § 1383a(a)(3). If, at any time, I make reference to an individual named "Patrick Rena," this is truly a reference to John Mitchell, who often uses the identity of Patrick Rena when conducting Social Security related business.

10. As background, Michael Mitchell was issued SSN 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 in December 1985. The SSA's systems list his parents as Doreen Mitchell and John Mitchell.

11. Relevant to the instant search warrant affidavit, beginning in or around 2001, Doreen Mitchell and John Mitchell made a series of representations to the SSA, more fully described below, that caused the SSA to believe that Doreen Mitchell's son, Michael Mitchell, was more mentally impaired than he truly was. Based on these representations, the SSA concluded that Michael Mitchell was eligible for SSI benefits. Additionally, since May 2014, Doreen Mitchell, John Mitchell, Michael Mitchell and Sonny Mitchell have appeared at interviews and examinations and willfully

misrepresented their actual levels of intelligence and functioning in order to seek benefits or ensure their benefits would continue.

12. On or about March 29, 2001, Doreen Mitchell applied for SSI benefits on Michael Mitchell's behalf, based on allegedly disabling mental impairments, including but not limited to mild mental retardation. At a July 20, 2001 psychological consultative examination, paid for by the SSA and related to Michael Mitchell's benefits application, the examiner assessed a Vineland Social Maturity Scale score of 55, which yielded a social age of 4.8 years old (he was 15 years old at the time) and a social quotient of 30, which led the examiner to assess a provisional diagnosis of moderate mental retardation. As a result, the SSA concluded that Michael Mitchell was disabled and entitled to SSI payments.

13. In or around 2004, the SSA / OIG / Cooperative Disability Investigations (CDI) Unit initiated an investigation into the Mitchell family based on an allegation that multiple family members were receiving benefits for the same or similar conditions, as well as inconsistencies in the SSA claim files. As part of this investigation, on May 6, 2004, during an approximately 35-minute ruse interview with an SSA / OIG Special Agent and a local sheriff's office detective working in the CDI Unit, Michael Mitchell was able to converse with investigators and answer most of the questions asked of him without hesitation. Contrary to the 2001 findings described above, he reported that he did some automotive work; drove a car despite not having a driver's license; shopped regularly; could handle cash; and had gone to Las Vegas to get married six months prior to the interview. He also arranged an interview between the investigators and his mother

for the following day, though that interview ultimately did not take place. Yet on May 22, 2004 – a little more than two weeks later – at a consultative examination related to his application for SSI benefits, Michael Mitchell would not respond to questions or speak, and no intelligence test could be performed because he did not cooperate with the examination.

14. As a result of the CDI investigation, Michael Mitchell's benefits were ceased because he did not meet the requirements of the SSI program. During the appeal of this decision, a hearings officer noted that Michael Mitchell had no problems talking to people whom he believed had nothing to do with his disability claim, but did not talk to people or answer questions when he was to see a counselor or other professional trying to evaluate his alleged mental condition. However, once Michael Mitchell appealed his cessation to an Administrative Law Judge (ALJ) that ALJ ordered a consultative examination in September 2007, at which Michael Mitchell was once again mute, uncooperative, and displayed evidence of disorientation and limited intelligence. As a result, the ALJ issued a decision relying entirely on these findings, giving little weight to the opinion that Michael Mitchell had no mental impairment and failing to reference either the hearings officer's findings or the CDI investigation in his decision to continue benefits.

15. Since in or around May 2014, I have conducted a second investigation into the Mitchells for similar conduct. On or about October 8, 2014, Michael Mitchell appeared for an interview related to his entitlement to SSI benefits at the SSA's Mid-Cities Office in Grand Prairie, Texas. Doreen Mitchell and John Mitchell, using the alias Patrick Rena,

accompanied him. Michael Mitchell attended the interview wearing a t-shirt and athletic shorts with unkempt hair and an unshaven face. He sat down, facing off to the side, and would not look either of the SSA employees in the eye or respond to questions. Doreen Mitchell and John Mitchell claimed that Michael Mitchell needed help completing simple tasks, did not interact with anyone he did not know (and, in fact, spoke only to her and John Mitchell), and had not worked since his last disability hearing in or around 2007. SSA employees reviewed the redetermination paperwork associated with this interview with both Doreen Mitchell and Michael Mitchell, who both signed forms indicating that they understood that anyone who misrepresented facts or lied to SSA was committing a federal crime. Doreen Mitchell signed the form in cursive and Michael Mitchell signed the form with a simple "M".

16. Contrary to Michael Mitchell's appearance at this interview and the representations made to SSA regarding Michael Mitchell's functioning, later that same day, Michael Mitchell was observed driving a vehicle, alone, which advertised paintless dent repair, and purchasing items from a gas station. On November 26, 2014, Michael Mitchell drove from an address in White Settlement to Doreen Mitchell's known residence, which is approximately 23 miles away. Michael Mitchell was also seen driving on January 8, 2015, again displaying signs on the vehicle advertising on the spot body repair. On January 16, 2015, Michael Mitchell drove his own vehicle from Doreen Mitchell's residence to a funeral home in Irving, Texas, where he spent the entire day and was observed socializing with family and friends. On January 21, 2015, Michael Mitchell was seen driving to a QT gas station, alone, and purchasing items. He was later

followed to a business where he appeared to be assisting friends or family with the purchase of a vehicle. Michael Mitchell test drove the vehicle and inspected the engine compartment as well as the vehicle's title. As he was able to leave the house unaccompanied, drive, perform work activity, and socialize with large groups of people, as well as appears to handle money and read a car title, Michael Mitchell clearly demonstrates a higher level of functioning than he related to the SSA.

17. On or about July 21, 2015, Michael Mitchell also appeared for a consultative examination with Dr. Alicia Coleman for the purpose of determining his continued right to disability benefits. During the interview, Michael Mitchell was uncooperative, selectively responsive and deemed to be a poor historian, so Dr. Coleman was required to obtain some information from John Mitchell, who appeared as Patrick Rena. Michael Mitchell wore stained and ill-fitting clothing, displayed poor hygiene and he frequently mumbled and was unintelligible at times. He claimed to experience auditory hallucinations of laughter, saw "all kinds" of people "all of the time," and reported symptoms of anxiety around "everyone I don't know." Contrary to what was observed prior to the examination, Michael Mitchell reported he was dependent upon others, specifically Patrick Rena, for transportation because riding the bus was "too scary," and that his family accompanies him shopping for basic necessities. He reported he spent his day watching cartoons. He responded to a question regarding whether he had ever had surgery with "pizza." Moreover, he could not identify his birth day, month, or year; the day of the week; or the city, county or state that he was in. While Michael Mitchell stated to Dr. Coleman that he did not know letters and could not sign his name, he had

signed other documents in his SSA file. As a result of the examination, Dr. Coleman determined that the information Michael Mitchell presented indicated a developmental or psychotic disorder, but that he seemed to overly emphasize the negative aspects of his condition for secondary gain. She did not believe the examination to be a valid assessment of Michael Mitchell's abilities or a valid representation of his true level of functioning and current abilities due to lack of cooperation and effort.

18. Contrary to Michael Mitchell's statements and presentation during the examination, two days later, on the afternoon of July 24, 2015, Michael Mitchell had care of a child, who he took to a gas station. While there, he pumped gasoline and talked to another customer about automotive bodywork, pointing to magnetic signs on his door. Michael Mitchell then drove for approximately one hour, but he drove in a manner intending to keep others from following him.

19. Since surveillance of the Mitchell family began in or around May 2014, investigators have noted that, despite alleging he was unable to drive, Michael Mitchell has had two vehicles registered in his name. In fact, on July 18, 2015, four days before a consultative examination, a new vehicle bearing signs advertising dent repair was located and found to be registered to Michael Mitchell. Based on my training and experience, I know that individuals receive numerous documents from the county for any vehicles they own. As a result, it is expected that such documents will be inside Michael Mitchell's residence.

20. Michael Mitchell has a State of Texas identification card (ID #21048629), which expired December 4, 2010. Michael Mitchell also has a State of Arizona driver's license

(DL #D03874025), which expires December 4, 2050. His address on that Arizona license is listed as 16880 N. 59th Avenue, Glendale, Arizona 85306. A Google search shows that the address belongs to a commercial address, which appears to be a "strip mall" shopping center, not a residential neighborhood.

21. On or about May 4, 2015, Michael Mitchell was observed driving, going to the grocery store by himself, shopping for groceries, and going to ACE Cash Express and leaving with paperwork. Subpoenaed records from ACE Cash Express disclosed that Michael Mitchell created an account on July 14, 2014, using the Arizona Driver's license bearing number D03874025. SA Brandon Bowron, SSA / OIG, verified that the aforementioned identification is a driver's license that was issued by the State of Arizona to Michael Mitchell on November 3, 2004 and bears his photograph. Michael Mitchell cashed two checks in 2014 and one check in 2015 at ACE Cash Express for $200.00, $125.00, and $4,191.21, respectively. The $4,191.21 check, whether income or resources, was not reported to the SSA, even though it might have affected his entitlement to SSI benefits. Further, the $200.00 check, cashed in July 2014, notes in the memo line that it is for "car repair," which corroborates surveillance observed by the investigators that Michael Mitchell is both capable of work activity and that that work activity has not been reported to the SSA.

22. Subpoenaed records from Bank of America disclosed that Michael Mitchell has a "Regular Savings" account (account # 004795872701); Doreen Mitchell is also on the account as Michael Mitchell's representative payee. Michael Mitchell's Social Security disability benefits are deposited into this account. Doreen Mitchell filled out a deposit

slip on October 11, 2014 for $85.00 cash and "Michael" was written in the lower right hand corner of the deposit slip.

23. Western Union records show numerous financial transactions affiliated with Michael Mitchell, Sonny Mitchell, and John Mitchell over the last five years. Some of the transactions are over $20,000 and have been sent by Michael Mitchell to overseas locations. These records suggest the existence of either additional sources of income or excess resources that would also impact Michael Mitchell's entitlement to benefits.

24. In interviews with the SSA, Doreen Mitchell and John Mitchell have claimed – and Michael Mitchell has not corrected them – that Michael Mitchell has never had a job. However, the apartment manager of the PREMISES told a CDI investigator that Michael Mitchell stated he worked while living in Phoenix, Arizona. The same apartment manager confirmed that Michael Mitchell is named on the lease for the PREMISES. Based on my training and experience, I know that individuals have to provide proof of current and/or prior employment or income when filling out rental applications. As a result, it is expected that such documents will be kept inside Michael Mitchell's residence.

25. Michael Mitchell has a valid Arizona driver's license, which, according to my investigation, he has used to open at least one account at ACE Cash Express. It is reasonable to believe that this identification, and any other identification he may hold, would realistically be kept in his residence when he is at home.

26. In interviews with the SSA, Doreen Mitchell and John Mitchell have claimed – and Michael Mitchell has not corrected them – that Michael Mitchell cannot manage his

own finances. However, my investigation shows that Michael Mitchell has paid bills via Western Union, such as a June 1, 2015 payment of $95.00 to Consumer Financial. Based on my training and experience, as well as common knowledge, I know that individuals receive paper invoices from creditors and that receipts of payment are provided from Western Union. As such, it is expected that these documents, and other documents associated with the payment of bills or the management of funds, will be found in Michael Mitchell's residence.

27. Based on the above information, including surveillance obtained on July 24, 2015, showing Michael Mitchell soliciting business for automobile repairs, I have reason to believe that Michael Mitchell has been and continues to perform work for cash, but has failed to report that work activity or income to the SSA. Moreover, his credit report indicates that he stated he had a job in order to secure credit to purchase a vehicle.

28. Further, based on my training and experience investigating federal crimes, I know that individuals engaged in benefit fraud and identity theft schemes engage in money laundering and other activities in an attempt to hide gains from the fraud and to hide income and assets. These individuals keep records of assets that are not reported to the various federal agencies, such as the SSA. In addition, individuals engaged in fraud schemes secrete items of value, cash, and records of hidden assets in their residences, vehicles and in properties under the names of co-conspirators.

29. Additionally, Michael Mitchell has presented himself to the SSA, and others have alleged on his behalf, that he cannot associate with others, read or write, and was dependent on others for assistance. As surveillance indicates that he enjoys a much

higher level of functioning, there is reason to believe that his home may contain evidence that he is not as mentally deficient or unable to associate with others as he has presented to the SSA, including items such as books, written correspondence, photographs of social activities, and recreational items, in addition to the evidence regarding work activity already discussed above.

30. As described in Attachment B, this application seeks permission to seize computers, cellular phones and other items where documents may be stored electronically. I submit that if a computer, cellular phone or electronic medium is found on the premises, no attempt will be made to search such a device and a separate affidavit will be submitted to search any devices seized that may contain evidence of an offense.

31. At the conclusion of the criminal investigation and any related criminal proceedings, the government will make reasonable efforts to return all data and data storage devices to the owner, except for any data or data storage devices which are contraband or instrumentalities of crime under federal or state law or which have been forfeited under federal or state law.

## CONCLUSION

32. I submit that this affidavit supports probable cause for a warrant to search the PREMISES and seize the items described in Attachment B.

_____
CYNTHIA M. ROBERTS
Special Agent
SSA/OIG


Subscribed and sworn to before me on this 25 day of September 2015

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

Residence located at 1509 Shamrock Bend Lane, #3923, Arlington, TX 76012, further described as an apartment within a multi-unit brick and siding building at the Westwood Canyon Apartments. Apartment #3923 is on the second floor of the building and faces east. It is accessible by stairs. The sign showing "39 3901-3904 3921-2934" is depicted on one side of the building. The number "3923" is depicted on a wall adjacent to the front door of the apartment. The lease for the apartment is in the name of Michael Mitchell.





ATTACHMENT B

All items, records, and information relating to violations of 42 U.S.C. § 1383a(a)(3), including the following:

A. FINANCIAL DOCUMENTS:
   1. Books, records, receipts, notes, ledgers, bank records, money orders, and other papers related to the above-described offense, including foreign and domestic bank records, such as those from the country of Jamaica;
   2. Books and records and documents related to the existence of assets;
   3. Books, records, receipts, documents, or ledgers related to the existence of work activity performed by Michael Mitchell;
   4. General ledgers, currency, cash receipts and disbursement journals and statements which may be stored manually (on paper) related to monetary transactions involving SSA benefits.

B. IDENTIFICATION:
   1. All identification documents and items in the name of, or in close variations of the names of the following individuals, who appear in documents related to Michael Mitchell's SSI benefits: Doreen Mitchell, John Mitchell, Michael Mitchell, Sonny Mitchell, Patrick Rena, Doreen Adams, Dinah Adams, Mike Mitchell, Sandra Davis (Sandra Mitchell or Katie Mitchell), and Scarlet Ellington.
   2. Any other identification documents that bear the photographs of Doreen Mitchell, John Mitchell, Michael Mitchell and Sonny Mitchell, including driver's licenses, state identification cards, Social Security cards, Medicaid cards, debit cards, bank cards, credit cards, western union cards, birth certificates, and letters.

C. ITEMS OF VALUE AND ASSOCIATED DOCUMENTS:
   1. Currency (United States currency or foreign currency), financial instruments, precious metals, and jewelry.
   2. Bank records, titles or deeds for real or personal property, promissory notes, or other documents related to financial transactions such as those for obtaining, transferring, storing, depositing, investing, laundering, concealing, or expending money.

D. OTHER ITEMS:
   1. Any and all vehicle documents, including titles and registrations; property documents; legal documents; tax documents; employment documents; items of mail, utility bills, insurance documents, other government documents and documents of private institutions that bear the names of, or

close variations of, the names of Doreen Mitchell, John Mitchell, Michael Mitchell, Sonny Mitchell and Patrick Rena.

2. Any and all documents related to claims for Social Security disability or issued by the Social Security Administration.

3. Telephone records, in whatever form, which show evidence of long distance phone calls.

4. Any tools, signage or training manuals associated with automobile repair or an automobile repair business.

E. ELECTRONICS: Cellular phones, mobile phones, blackberries, pagers, computer hardware, meaning any and all computer equipment and peripheral devices. Included within the definition of computer hardware, but not all inclusive, is any electronic device capable of data processing (such as central processing units, laptop or notebook computers, personal digital assistants, and wireless communication devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media); related communications devices (such as modems, cables and connections); digital media (such as cameras), storage media, and security devices, which will be seized and searched with an additional warrant. The following definitions apply to these terms as set out in this attachment:

1. A cellular telephone or mobile telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other cellular telephones or traditional "land line" telephones. A cellular telephone usually includes a "call log," which records the telephone number, date, and time of calls made to and from the phone.

2. In addition to enabling voice communications, cellular telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

3. "Blackberry" is a brand of handheld wireless electronic communications devices made by Research in Motion. Blackberries generally enable users to send email, make and receive telephone calls, access the Internet, and organize appointments and contact information. Certain Blackberries can also send instant messages, take digital pictures or moving video, or store and play digital music or

video files. Blackberries may also contain GPS technology for determining the location of the device.

4. A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

5. A digital camera is a device that records still and moving images digitally. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

6. A portable media player (e.g. MP3 Player and iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photograph files. However, a portable media player can also store any digital data, such as word processing documents, even if the device is not designed to access such files. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

7. A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as a wireless communication device and are used to access the Internet and send and receive email. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.